UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYNTHES, INC and DEPUY SYNTHES SALES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> GREGORY KNAPP, <br><br> Defendant. | No. 2:13-cv-02261-MCE-DB <br><br> **MEMORANDUM AND ORDER** |

Plaintiffs Synthes, Inc. and DePuy Synthes Sales, Inc. ("DSS") bring this suit against one of its former employees, Defendant Gregory Knapp. They allege that Knapp violated his non-competition agreement, violated his non-disclosure agreement, misappropriated trade secrets, and breached his fiduciary duty to his employer. Before the Court is Defendant's Motion for Summary Judgment ("MSJ"), ECF No. 77, in which he challenges both Plaintiffs' standing to enforce the non-competition agreement and the non-competition agreement's general enforceability. He also contends that Plaintiffs have failed to put forth sufficient evidence for the other claims against him to proceed to trial. As explained below, Defendant's MSJ is GRANTED IN PART and DENIED IN PART.[1]

---

[1] Because oral argument would not be of material assistance, the Court ordered the matter submitted on the briefs. E.D. Cal. Local Rule 230(g).

1

# BACKGROUND[2]

Knapp worked as a salesman for Synthes products since 1989, and began selling Synthes spine implants to surgeons in 1993. When Knapp was originally hired, he worked for the unincorporated Spine Division of Synthes, Inc. Some time prior to 1993, Synthes Spine Company was created as a corporate subsidiary of Synthes, Inc. In 1993, Synthes Spine Company became Knapp's direct employer, and in 1994, he signed a non-disclosure agreement ("NDA"). In 2006, Synthes Spine Company required that Knapp sign a Confidentiality, Non-Solicitation, and Non-Competition Agreement ("NCA"). Knapp signed the NCA in consideration for a compensation plan offered to certain Synthes sales consultants called the Long Term Sales Incentive Plan ("LTSIP") as well as "a guarantee of 60 days advance notice of termination or severance pay in lieu of notice." NCA, ECF No. 92-1, Ex. 8, at 3. Plaintiffs describe the LTSIP as a primary tool to prevent their sales consultants from being hired away by competitors.

In June 2012, Johnson & Johnson ("J&J") acquired Synthes, Inc.'s stock in a reverse merger. The following year, Knapp began working for K2M, Inc., a competitor. Knapp transferred millions of dollars' worth of clients from Synthes products to K2M products. Plaintiffs allege that in doing so, Knapp violated both his NDA and NCA, as well as misappropriated trade secrets and violated his duty of loyalty to his employer.

To a large degree, this case involves the effect of Synthes, Inc.'s merger with J&J, so a brief description of that transaction as it relates to Knapp's employment is necessary. As described above, prior to J&J's acquisition of Synthes, Knapp's direct employer was Synthes Spine Company, a corporate subsidiary of Synthes, Inc. In 2008, Synthes Spine Company was converted into a Delaware limited liability company and changed its name to Synthes USA Sales LLC ("SUSA"). As part of the merger with J&J, SUSA was merged into J&J's existing spine implants division, DePuy Spine, Inc, and its

---

[2] Unless otherwise noted, the following facts come from Defendant's Statement of Undisputed Facts. ECF No. 92

assets were distributed to the newly created DSS, a subsidiary of DePuy Spine, Inc. These transactions made DSS Knapp's direct employer.

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. Celotex, 477 U.S. at 325.

Rule 56 also allows a court to grant summary judgment on part of a claim or defense, known as partial summary judgment. See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."); Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378–79 (C.D. Cal. 1995). The standard that applies to a motion for partial summary judgment is the same as that which applies to a motion for summary judgment. See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary judgment standard to motion for summary adjudication).

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288–89 (1968).

///

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251–52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp & Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987). The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In other words, the judge needs to answer the preliminary question before the evidence is left to the jury of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)). As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id. at 587.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Anderson, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.
///

Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

**ANALYSIS**

**A.     Breach of the NCA**

Defendant argues that California law applies to the NCA, and because such agreements are void under California law, he is entitled to summary judgment. See Def.'s MSJ, at 6–7 (citing Cal. Bus. & Prof. Code § 16600). Plaintiffs, conversely, argue that Pennsylvania law applies because of the choice of law provision contained within the NCA. See Pls.' Opp'n to MSJ, at 8–9. "In Pennsylvania, restrictive covenants are enforceable if they are incident to an employment relationship between the parties; the restrictions imposed by the covenant are reasonably necessary for the protection of the employer; and the restrictions imposed are reasonably limited in duration and geographic extent." Hess v. Gebhard & Co., 808 A.2d 912, 917 (Pa. 2002). Defendant argues first that California law applies to the NCA and, in the alternative, that the NCA is unenforceable even under Pennsylvania law.

**1.     Choice of Law**

As mentioned above, the NCA specifically includes a choice of law clause: "This agreement will be governed by Pennsylvania law applicable to contracts entered into and performed in Pennsylvania." Statement of Undisputed Facts ("SUF"), Ex. 8, ECF No. 92-1, at 111. "The first step in interpreting [a choice-of-law] clause is to apply the correct choice-of-law rules." Paracor Fin., Inc. v. Gen. Elect. Corp., 96 F.3d 1151, 1164 (9th Cir. 1996). Generally, "[i]n determining the enforceability of a choice of law provision in a diversity action, a federal court applies the choice of law rules of the forum state." Hatfield v. Halifax PLC, 564 F.3d 1177, 1182 (9th Cir. 2009). However, when a suit is transferred pursuant to 28 U.S.C. § 1404(a), the substantive law of the state in which the suit was originally filed applies. "A change of venue under § 1404(a) generally

///

should be, with respect to state law, but a change of courtrooms." Van Dusen v. Barrack, 376 U.S. 612, 639 (1964).

This lawsuit was originally filed in the Eastern District of Pennsylvania. In October 2013, it was transferred to this District pursuant to 28 U.S.C. § 1404(a). Accordingly, Pennsylvania choice-of-law principles control the determination of which law applies to the NCA. Further, in deciding an issue under state law, "the task of the federal courts is to predict how the state high court would resolve it." Air-Sea Forwarders, Inc. v. Air Asia Co., 880 F.2d 176, 186 (9th Cir. 1989). Thus, the task of this Court is to predict how the Pennsylvania Supreme Court would resolve whether Pennsylvania or California law applies to the NCA.

Pennsylvania has adopted § 187 of the Restatement (Second) of Conflict of Laws. See Miller v. Allstate Ins. Co., 763 A.2d 401, 403 (Pa. Super. Ct. 2000) (applying § 187 to a choice of laws dispute). The first part of that section states: "The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." Restatement (Second) of Conflict of Laws § 187(1) (Am. Law Inst. 1971). If a particular issue cannot be resolved by an explicit provision, the court applies a balancing test to determine whether the choice-of-law clause should be given effect. See id. § 187(2). Issues that cannot be resolved by an explicit provision include matters such as whether "a party lacked the capacity to contract or [whether] the contract is illegal." Synthes USA Sales, LLC v. Harrison, 83 A.3d 242, 254 (Pa. Super. Ct. 2013). This is because the "power [of the contracting parties] to choose the applicable law is subject to . . . two qualifications." Restatement (Second) of Conflict of Laws § 187, cmt. d (Am. Law Inst. 1971). Those two qualifications require that (1) there be a "reasonable basis for the parties' choice" and (2) "application of the law of the chosen state" not "be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state." Id. § 187(2)(a)–(b). When determining whether these two prongs are fulfilled, "[t]he forum will apply its

own legal principles," id., which in this case would be the legal principles of Pennsylvania, the original forum.

Defendant argues that "whether the [NCA] is enforceable by Plaintiffs . . . is not [an issue] the parties could have resolved by an explicit provision in the [NCA]," and thus § 187(1) of the Restatement does not apply. Def.'s Reply, at 2 (emphasis removed). Defendant, however, misses the mark. At issue here is not a contract that defines the relationship between Plaintiffs and Defendant following a merger, but a contract that concerns something the parties explicitly addressed in the NCA: non-competition and non-solicitation. See Harrison, 83 A.3d at 254. The real question here is whether the parties had the power to override choice-of-law principles that would result in the application of California law and agree by contract that Pennsylvania law applies to the restrictions on competition and solicitation. Phrased another way, the question is whether the parties could override California law and incorporate by reference Pennsylvania's determination that NCAs are enforceable under certain circumstances.

The Court must therefore analyze whether the choice-of-law clause contravenes either of the two qualifications placed on the parties' ability to specify which law applies to the NCA. First, Defendants do not contend that the parties lacked a reasonable basis in choosing Pennsylvania law to govern the contract. Indeed, the development of the NCA and LTSIP was centered in Pennsylvania. Pls.' Statement of Disputed Facts ("SDF"), ECF No. 90, ¶¶ 20–21. Defendant does, however, address the second qualification. He argues that choosing Pennsylvania law to govern the NCA contravenes a fundamental policy of California and that California has a materially greater interest in the dispute. In support of this argument Defendant only provides cases in which courts applied California choice-of-law principles. See Def.'s MSJ, at 7. These cases are of little value as the Court must predict how a Pennsylvania court would resolve the issue.[3]

///

---

[3] It is not dispositive that California choice-of-law principles are couched in the same language as Pennsylvania choice-of-law principles. This Court must apply § 187 of the Restatement as interpreted by Pennsylvania courts.

7

Looking to Pennsylvania caselaw, it is not clear that Pennsylvania courts would find California's policy against the enforceability of NCAs fundamental. See Depuy Synthes Sales, Inc. v. Edwards, 23 F. Supp. 3d 472, 482 (E.D. Pa. 2014) (applying Pennsylvania conflict-of-law principles to evaluate an NCA, and declining to determine "whether or not application of Pennsylvania law would be contrary to fundamental policies of California"); Cottman Transmission Sys., Inc. v. Melody, 851 F. Supp. 660, 673 (E.D. Pa. 1994) (finding it unlikely that the plaintiff would succeed on the merits of its enforcement of an NCA because doing so would "violate a clearly enunciated public policy of the State of California"). However, at least one court applying Pennsylvania principles has found that whatever California's interest in declining to enforce NCAs, it "is not materially greater than the substantial interest of Pennsylvania" in uniformity of contract. Edwards, 23 F. Supp. 3d at 482–83.

Ultimately, this Court finds Harrison most persuasive in its task of predicting how the Pennsylvania Supreme Court would weigh the competing interests of California and Pennsylvania. This is because in Harrison, the Superior Court of Pennsylvania[4] analyzed a contract that is almost identical to the one at issue in the instant case and found Pennsylvania law applied. The facts of the instant case are extremely similar to Harrison, in which the predecessor to DSS sought enforcement of an NCA signed by an employee who resided and worked in the Eastern District of California during his employment. 83 A.3d at 245. Though not directly addressing which state had a materially greater interest in the NCA, the Superior Court of Pennsylvania reversed the trial court's ruling that Pennsylvania law did not apply to the NCA for work performed outside of Pennsylvania. Id. at 252. Defendant does not distinguish Harrison in any

///

---

[4] It does not appear that the Supreme Court of Pennsylvania has addressed the competing interests of Pennsylvania and of any state that prohibits covenants not to compete. The rulings of the Superior Court of Pennsylvania—one of the commonwealth's two intermediate appellate courts—however, are instructive. See Air-Sea Forwarders, 880 F.2d at 186 ("The decisions of the state's intermediate appellate courts are data that a federal court must consider in undertaking this analysis [of predicting how the state high court would resolve a state law issue].")

meaningful way,[5] and accordingly the Court finds that a Pennsylvania court applying Pennsylvania choice-of-law principles would find that the contract is subject to Pennsylvania law.

### 2. Standing to Enforce NCA

Defendant argues that—for different reasons—neither DSS nor Synthes, Inc. have standing to enforce the NCA. Though cast as arguments that the NCA's choice-of-law provision is invalid, it is better analyzed as an attack on the enforceability of the NCA under Pennsylvania law, which as determined above applies to the non-compete and non-solicitation clauses of the contract. The Court addresses each Plaintiff in turn.

First, Defendant argues that the transactions transferring Knapp's employment to DSS render DSS unable to enforce the NCA. Under Pennsylvania law, an NCA is not assignable when transferred through a sale of assets. Hess, 808 A.2d at 922 ("[W]e hold that a restrictive covenant not to compete . . . is not assignable to the purchasing business entity, in the absence of a specific assignability provision, where the covenant is included in a sale of assets."). This is because an employment contract is of a personal nature, and is confined to the employer with whom the covenant was made. See id.

Conversely, NCAs follow transfers made by purchases of stock. Siemens Med. Sols. Health Servs. Corp. v. Carmelengo, 167 F. Supp. 2d 752, 758–59 (E.D. Pa. 2001). This is because "[i]t is a basic tenet of corporate law that a change in stock ownership is merely a transfer of shareholder rights which does not, in and of itself, normally affect the existence of the corporate entity." Id. That is, an NCA is still enforceable after a transfer of stock because the original party to the NCA remains the employee's employer. Pennsylvania law applies this same logic to analogous transfers in ownership, such as

---

[5] Defendant attempts to distinguish Harrison on the basis that "the parties in the litigation were identical to the parties to the non-competition agreement at issue," unlike in the instant case due to the merger with J&J. Def.'s Reply, at 3. He argues that this difference renders the choice-of-law clause inapplicable because "the parties to [the] agreement could not have controlled through contract drafting [for] a change in the respective positions of the parties as the result of a corporate merger." Id. As indicated above, Defendant's focus misses the mark. Defendant's arguments are better addressed as an attack on the enforceability of the NCA under Pennsylvania law.

9

transfers of membership interests in an LLC.  See Missett v. Hub Int'l Pa., LLC, 6 A.3d 530, 536 (Pa. Super. Ct. 2010).

Defendant focuses on the details of the merger to argue that DSS cannot enforce the NCA.  J&J merged Synthes, Inc. into a subsidiary corporation via a transfer of stock.  However, in merging Synthes's spine sales subsidiary with J&J's DePuy spine sales subsidiary, J&J used a third subsidiary—Plaintiff DSS—into which the spine sales assets of both Synthes and DePuy were transferred.  Defendant, therefore, contends that his employment was transferred from SUSA to DSS via a sale of assets—not via a transfer of stock—and accordingly, DSS cannot enforce the NCA.  Def.'s MSJ, at 10.

Defendant, however, misses the forest for the trees.  The precipitating event of the corporate reorganization was a sale of stock—Synthes, Inc.'s stock was transferred to J&J.  The fact that Synthes, Inc.—once it became a subsidiary of J&J—decided to combine two of its divisions by contributing the two divisions' assets into a third (wholly owned) entity does not change the analysis.  Under Defendant's reasoning, different results are created merely by the technical method by which subsidiaries are combined, not the substantive positions of the relevant parties.  Pennsylvania law's distinction, however, between the treatment of NCAs completed by sales of stock and those completed by sales of assets rests not on these sorts of technical grounds, but on the substantive character of those transactions.  See Missett, 6 A.3d at 537 (applying the logic undergirding the transferability of NCAs in sales of stock to sales of "membership interests" in a limited liability company).  Here, the overall substantive character of the merger was that of a sale of stock, not that of a sale of assets.  Accordingly, DSS has standing to enforce the NCA because the NCA was assigned to it during the merger of Synthes, Inc. and J&J.  Regardless of the particular transactions resulting in the creation of DSS, Defendant's employer has not changed since he signed the NCA.

Even if DSS did not have standing to enforce the NCA, Synthes, Inc. does.  Synthes, Inc. was expressly named as a third-party beneficiary to the NCA.  Defendant nevertheless argues that Synthes, Inc. is not a proper third-party beneficiary because "it

is unclear which 'Synthes, Inc.'" the NCA identifies. Def.'s MSJ, at 14. Defendant provides proof that at different points in time, three entities known as "Synthes, Inc." existed and that they all were "evidently part of Synthes'[s] so-called 'family of businesses.'" Id. at 14–15. Defendant then argues that NCAs must be construed strictly against the employer, and that a strict construction of this ambiguity forecloses Plaintiff Synthes, Inc. from being considered an express third-party beneficiary. Id. at 15.

Defendant's arguments are unavailing for several reasons. As an initial matter, the express third-party beneficiaries named in the NCA are not limited to one "Synthes, Inc." Instead, it names as third-party beneficiaries "any affiliates, subsidiaries, divisions, or related companies" of Synthes Spine Company, "including but not limited to . . . Synthes, Inc." SUF, Ex. 8, at 109–10. This language, interpreted plainly, encompasses all three entities known as Synthes, Inc. Forming "part of Synthes'[s] so-called 'family of businesses,'" all were affiliated with Synthes Spine Co.

Furthermore, Defendant cannot use extrinsic evidence to create an ambiguity where none exists. "Where the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence." Steuart v. McChesney, 444 A.2d 659, 661 (Pa. 1982). Under Pennsylvania law, a contract

> will be found ambiguous if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning. A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction.

Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc., 247 F.3d 79, 93 (3d Cir. 2001) (quoting Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 614 (3d Cir. 1995)). Defendant does not provide any information about these two other entities named Synthes, Inc. or their relationship to Synthes Spine Co. and Defendant's employment that would counter the natural reading that the Synthes, Inc. named as the third-party

beneficiary is the ultimate parent company of Defendant's employer.[6]  Accordingly, the contract in question here is not "reasonably or fairly susceptible" to any construction other than Plaintiff Synthes, Inc. is the third-party beneficiary named in the NCA.

### 3. General Enforceability of the NCA Under Pennsylvania Law

As noted above, "in Pennsylvania, restrictive covenants are enforceable if they are incident to an employment relationship between the parties; the restrictions imposed by the covenant are reasonably necessary for the protection of the employer; and the restrictions imposed are reasonably limited in duration and geographic extent." Hess, 808 A.2d at 917.  The NCA purports to restrict Defendant from soliciting any Synthes Spine customer "for the purpose of competing or interfering with any part of Synthes Spine's Business" for a period of 18 months.  NCA, at 5.  It also states that Defendant "will not solicit, contact, call on, transact or engage in any business activity . . . with any Customer with whom [he] had any dealing on behalf of Synthes Spine" for 18 months. Id.  Defendant argues that "the undisputed facts fail to establish that Plaintiffs have a protectable business interest in the enforcement of the [NCA]" and that it accordingly is unenforceable under Pennsylvania law.  Def.'s Reply, at 8.  Defendant's arguments, however, are unpersuasive as they rest mainly on the same premises undergirding Defendant's objection to Plaintiffs having standing to enforce the NCA.

Defendant, however, also contends that the NCA was not "reasonably necessary for the protection of the employer" because "Knapp worked for Synthes for 16 years without having ever signed a restrictive covenant." Id.  Such a conclusory statement is insufficient to support summary judgment in Defendant's favor.  That Knapp worked for Synthes for 16 years without an NCA only evinces that Synthes did not attempt to protect itself, not that an NCA isn't reasonably necessary to protect Synthes.  Second, Defendant ignores Plaintiffs' testimony that the NCA was created in response to

---

[6] For example, if Defendant had a relative also named Gregory Knapp, Defendant's argument would be akin to arguing that mentions to "Gregory Knapp" in a contract are ambiguous because there are two "Gregory Knapps" forming part of the same "family of Knapps."  While perhaps a creative argument, it is unpersuasive.

12

"Synthes believ[ing] that a competitor was targeting key Synthes sales consultants by using a stolen confidential document that listed employees who did not at that time have non-solicitation restrictions post-employment." Pls.' Opp'n, at 4.

Finally, Defendant contends that Synthes, Inc. does not have a "legitimate protectable interest in the agreement" because it is merely a holding company. Def.'s MSJ, at 13. In doing so, he relies primarily on Hess, where the court found that "pure financial gain at the expense of restricted competition is insufficient to constitute a protectible business interest." 808 A.2d at 923. The facts of that case are wholly unlike the present one. In Hess, which also concerned the assignability of NCAs, the original employer had two primary businesses: insurance and real estate. Id. at 914. The insurance portion of the business was sold, and as part of the sale price, the original employer received part of the commissions and fees earned by the purchaser. Id. at 915. It was this minimal financial interest in the commissions that the Pennsylvania Supreme Court found to be an insufficient business interest to support enforcement of an NCA. Here, Synthes, Inc. is the ultimate parent company of DSS and has a direct interest in DSS's business and its trade secrets. Cf. Synthes, Inc. v. Emerge Med., Inc., 25 F. Supp. 3d 617, 687 (E.D. Pa. 2014) (treating Synthes, Inc. and several of its divisions collectively as "Synthes" and finding that "Synthes had a legitimate protectible business interest in its wide array of trade secrets" sufficient to support an NCA"). Thus, Defendant has failed to show that the NCA is unenforceable under Pennsylvania law and is accordingly not entitled to judgment as a matter of law on Plaintiffs' claims predicated on a breach of the NCA.

### 4. Election of Remedies

Defendant also argues that Plaintiffs have "elected, and executed on, a remedy that is inconsistent with the remedies they now pursue," barring their pursuit of damages for breach of the NCA in this lawsuit. Defendant states that in April 2014, "J&J seized Knapp's entire [LTSIP] account . . . , evidently based on J&J's unilateral decision that Knapp had violated the [NCA]." Def.'s MSJ, ECF No. 78, at 3. Defendant then argues

that this seizure of his LTSIP funds served as a remedy for any breach of the NCA. Defendant, however, is incorrect. Though the LTSIP and NCA are interrelated, they are not the same contract. Defendant's argument relies on what amounts to a rewriting of the NCA.

The LTSIP is an ERISA-qualified plan that at times references the NCA. Its references to the NCA are related to establishing the conditions for when the plan takes effect and the forfeiture of its benefits should the employee violate his NCA. In the section relevant to the instant dispute, the LTSIP plan document reads: "A Participant who has terminated employment shall forfeit all amounts allocated to his Account if he/she violates the terms of his/her Non-Compete Agreement following such termination." Synthes LTSIP, Pls.' SDF, Ex. J, at 8 (filed under seal). Defendant reads this language to mean that "[t]he Non-Compete . . . ostensibly entitles SSC to take back all funds it deposited in Knapp's LTSIP account dating back to 2006 as a remedy for Knapp's breach of the agreement." Defs.' MSJ, at 16. Thus, Defendant continues, Plaintiffs have already "elected—and executed on—a remedy" for the claim of breach of the NCA in this suit. Id. at 16–17.

Defendant, however, incorrectly conflates the two separate agreements. While it may be literally true that breach of the NCA "entitles" Plaintiffs to recoup the funds deposited into Defendant's LTSIP, it is only because breach of the NCA is a condition for executing a term of the LTSIP itself.[7] The LTSIP is not integrated into the NCA, and the NCA does not reference the LTSIP as the penalty for its violation. Because Plaintiffs allege a breach of the NCA, the terms of the NCA—not of the LTSIP—are at issue. A section of the NCA specifically addresses remedies, and nowhere in that section does it mention the LTSIP. See Confidentiality, Non-Solicitation and Non-Competition Agreement, SUF, Ex. 8, at 110. Instead, it states that "a breach may cause irreparable injury to Synthes Spine or the third-party beneficiaries that could not be compensated by

---

[7] The Court notes that violating the NCA is not the only way that a participant can forfeit his LTSIP funds. LTSIP funds are also forfeited if a participant is terminated "for cause." Synthes LTSIP, Pls.' SDF, Ex. J, at 8.

14

money damages."[8] Id.  It makes little sense, then, to read the NCA as incorporating the LTSIP as a remedy for breach.  Accordingly, Defendant's argument that forfeiture of Defendant's LTSIP funds bars Plaintiffs from pursuing this action for breach of the NCA is unavailing.

In sum, none of Defendant's arguments for summary judgement on Plaintiffs' claims for breach of the NCA are sufficient.  First, the NCA is enforceable.  Because of the NCA's choice-of-law clause, Pennsylvania law applies, and Defendant has failed to show that the NCA is unenforceable under Pennsylvania law.  Furthermore, both DSS and Synthes, Inc. have standing to enforce the NCA.  Finally, executing a term in the LTSIP that caused Defendant to forfeit his LTSIP funds does not constitute an election of remedies for his alleged violation of the NCA.  Therefore, Defendant's motion is DENIED with regard to Plaintiff's claim for breach of the NCA.

### B.  Breach of the NDA

Defendant contends that Plaintiffs have provided no evidence to support their claims that Defendant shared confidential information.  In response, Plaintiffs argue that there is evidence that Defendant had access to confidential information and that he "took all this knowledge with him to K2M and has admitted to using it to help sell K2M products."  SDF, ¶ 66.  The evidence cited by Plaintiffs for this "admission" is Defendant's deposition.  However, in the portion cited, Defendant only admitted to using his knowledge of various doctor's personal preferences, which he learned through working for Plaintiffs.  See Dep. of Gregory Knapp, at 49:9–17 (filed under seal).  Thus, Plaintiffs provide no evidence for their claim that Defendant used "all his knowledge" in working for K2M.  Moreover, Plaintiffs have not shown that the doctors' personal preferences, the one piece of information he actually admits to using, are trade secrets.  See Christopher M's Hand Poured Fudge, Inc. v. Hennon, 699 A.2d 1272, 1275 (Pa.

---

[8] The conflation of the LTSIP and NCA is clearest in the following passage of the MSJ: "By taking Knapp's entire LTSIP account as a remedy for his alleged breach of the [NCA] . . . Plaintiffs contradict the language of the LTSIP that there is no adequate legal remedy . . . ."  Def.'s MSJ, at 16.  No such language exists in the LTSIP; it is only found in the NCA.

15

Super. Ct. 1997) ("The plaintiff bears the burden on establishing the existence of a trade secret.") Plaintiffs' Opposition is devoid of any argument supporting the idea that doctors' personal preferences are trade secrets under Pennsylvania law, and it appears likely that they should not be so considered. Cf. id. ("A trade secret . . . does not include . . . subjective knowledge . . . [an employee] obtains while in the course of his employment . . . ." (final ellipsis in original) (quoting Pittsburgh Cut Wire Co. v. Sufrin, 38 A.2d 33, 34 (1944))).

Accordingly, Plaintiffs have not demonstrated that any genuine issue of material fact exists as to their claim for breach of the NDA. Defendant's motion is GRANTED with regard to Plaintiffs' claim for breach of the NDA.

### C. Misappropriation of Trade Secrets

Defendant contends that "Plaintiffs have not identified any 'trade secret' that Knapp allegedly took." Def.'s MSJ, at 19. In response, Plaintiffs merely argue that "customer lists, competitor information, customer preferences[,] and information about [DSS's] future technologies and future products" are trade secrets and that "[a] jury can reasonably infer that Knapp used his access to [Plaintiffs'] secret information to move its customers overnight." Pls.' Opp'n, at 18–19. First, even though the items listed by Plaintiffs are sometimes considered trade secrets, they have not met their burden in establishing that they are trade secrets entitled to protection under Pennsylvania law. Second, even if the items taken are considered protected trade secrets, a claim of misappropriation hinges on the use of those trade secrets. Plaintiffs have not provided any evidence that Defendant used any trade secrets he may have acquired from Plaintiffs. Their conclusory statement reproduced above is not sufficient to defeat a motion for summary judgment.

Accordingly, Plaintiffs have provided no evidence that creates a genuine issue as to whether Defendant misappropriated trade secrets, and Defendant's motion is GRANTED regarding Plaintiffs' misappropriation of trade secrets claim.

///

1      **D.     Violation of the Duty of Loyalty**

Diverting business to a competitor in anticipation of employment with that competitor is a violation of an employee's duty of loyalty toward his employer. SHV Coal, Inc. v. Cont'l Grain Co., 545 A.2d 917, 921 (Pa. Super. Ct. 1988); see also Fowler v. Varian Assocs., 196 Cal. App. 3d 34, 41 (1987) ("California law does not authorize an employee to transfer his loyalty to a competitor. During the term of employment, an employer is entitled to its employees' undivided loyalty." (citation omitted)).[9] Plaintiffs have provided evidence that Defendant sold K2M products to Plaintiffs' former clients the Monday following the Friday he resigned, as well as testimony that doing so would be "nearly impossible" without advance planning. Dep. of Mark Sienkiewicz, SUF, Ex. 41 (filed under seal), at 51:9–12. This is because a sales person would have to both (1) get the product to the hospital, and (2) persuade a doctor to use the new product. Dep. of Mark Sienkiewicz as Corporate Designee, SUF, Ex. 35 (filed under seal), at 17:11–20). Plaintiffs also provide evidence that Defendant knew about issues his clients had with Synthes products, that Defendant did nothing to try and fix those issues, that a sales person of Defendant's caliber never would have ignored such issues, and that those clients began using K2M products in the wake of Defendant's inattention. Dep. of Andrew Purdy, ECF No. 90-1, Ex. A, at 21:4–24:5.

Thus, Plaintiffs have identified genuine issues of material fact as to whether Defendant began diverting business to K2M while he was still employed by Plaintiffs and the Court cannot enter summary judgment on Plaintiffs' claim for violation of the duty of loyalty. Defendant's motion is therefore DENIED on Plaintiffs' claim for violation of the duty of loyalty.

///
///
///

---

[9] Neither Plaintiffs nor Defendant provides any arguments as to whether California or Pennsylvania law applies to Plaintiffs' violation of the duty of loyalty claim. However, the two states' law is sufficiently similar that this Court need not determine which applies for purposes of the instant motion.

17

**CONCLUSION**

For the reasons provided above, Defendant's Motion for Summary Judgment, ECF No. 77, is GRANTED IN PART, and DENIED IN PART. Summary judgment is granted with respect to Plaintiffs' claims for misappropriation of trade secrets and for violation of Defendant's non-disclosure agreement. Summary judgment is denied with respect to Plaintiffs' claims for violation of Defendant's non-compete agreement and for violation of the duty of loyalty. Pursuant to the Stipulation and Order filed on February 3, 2017, ECF No. 94, the parties are directed to file a Joint Notice of Trial Readiness not later than ninety (90) days after the electronic filing of this Memorandum and Order.

IT IS SO ORDERED.

Dated: April 18, 2017

MORRISON C. ENGLAND, JR
UNITED STATES DISTRICT JUDGE